Carr Coal Company v. Commissioner.
Carr Coal Co. v. Commissioner
Docket No. 6577.
United States Tax Court
1946 Tax Ct. Memo LEXIS 193; 5 T.C.M. (CCH) 364; T.C.M. (RIA) 46110; May 14, 1946
*193 The respondent's determination of allowable salaries for petitioner's three principal officers in 1941, held, reasonable on the evidence as to the officers' qualifications and services performed by them. Charles B. McInnis, Esq., Transportation Bldg., Washington, D.C., for the petitioner. Brooks Fullerton, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding involves deficiencies in income tax, declared value excess profits tax, and excess profits tax for 1941 in the respective amounts of $8,879.47, $5,133.53, and $18,372.30. The only question in issue is the reasonableness of the salaries which petitioner paid to its three principal officers in the taxable year. Other adjustments have been made in the deficiency notice which are not here in controversy. Findings of Fact Petitioner is a Pennsylvania corporation with its principal place of business at Wilkinsburg, Pa. It filed its returns for 1941 with the collector of internal revenue for the twenty-third district of Pennsylvania, at Pittsburgh. Petitioner was organized in 1934 to act as a selling agent for the coal produced by the John Carr Coal Co. *194 All of its capital stock was owned by that company until 1938 when it was purchased by John S. Carr, principal stockholder of the John Carr Coal Co. Petitioner's paid-in capital amounted originally to only $500 but was later increased by the forgiveness of an indebtedness which it owned to the John Carr Coal Co. In 1939 petitioner acquired several coal leases and some equipment and began mining coal by the stripping method. Its production for that year amounted to only about 25,000 tons but was increased to, in round figures, 125,300 tons in 1940 and 193,600 in 1941. Most of petitioner's leases were on lands from which the subsurface coal had been removed by the deep mining method, leaving small deposits between the surface outcropping of the coal seam and the deep mining operations. By the stripping method of mining the overburden of soil and rock was removed with steam shovels or bulldozers and the coal then loaded directly on the surface conveyances. The stip coal, as it is known, is usually inferior to the deep mine coal and is not so much in demand on the market. Also it varies considerably in quality even in the same area and has to have careful and constant inspection *195 to insure a merchantable product. In 1941 petitioner's officers and directors consisted of John S. Carr, secretary and treasurer, and sole stockholder, his brother, James E. Carr, president, and his son, John N. Carr, vice president. John S. Carr had had long experience in coal mining, having been engaged in that business since about 1916. In addition to his other duties he handled all the sales of coal to be shipped by rail, acted as credit manager, and assisted in obtaining new leases of coal lands. James E. Carr, petitioner's president, was also an experienced coal mine operator. In addition to his duties as president he served as superintendent and principal engineer. Among his duties were those of "laying out" the operations on a new lease and supervising the progress of the work. John N. Carr is the son of John S. Carr He became 21 years of age during 1941 He graduated from high school and attended Pittsburgh University for one year. For a portion of 1939 and 1940 he served as superintendent of the East McKeesport Coal Co., the stock of which was owned by John S. Carr and his brother, when that company was in the process of winding up its business. His total earnings amounted *196 to about $300 in 1939. In 1940 he received a salary of $1,800 from the East McKeesport Coal Co. and $600 from the petitioner. During 1941 he devoted all of his time to the petitioner. He became vice president in January, 1940. He also served as manager of the main office and the field offices in 1941. His duties were to sign checks for the company, check the pay roll, make the necessary adjustments in the employees' pay, and keep in touch with the office work both at the main office and in the field. He helped look after the maintenance and repair of the equipment, some of which he designed himself, and assisted in obtaining new leases. He also had charge of the sale of coal to truckers. Whenever the coal being mined was of a quality suitable for domestic consumption the truckers were notified and would come and purchase the coal at the mines. They were not employees of the petitioner but were independent truckers who purchased and hauled the coal for their own account. All three of petitioner's officers were familiar with every department of the business, so that when one was absent the others could take care of his duties. Through their combined efforts the business was operated *197 efficiently and profitably. The following table shows the number of tons of coal mined and sold by petitioner in the years 1940 and 1941, the gross sales, cost of goods sold, the profit (after officers' salaries), and the total of officers' salaries: Tonnage
Mined
Gross
Cost of
Officers'
Year
and sold
Sales
Goods Sold
Profit
Salaries
1940
125,328.41
$200,800.62
$165,008.86
$ 8,465.01
$11,800.00
1941
193,617.35
365,544.87
247,191.19
31,300.13
64,110.00
The total capital invested in petitioner in 1941, as well as in 1942 and 1943, was $21,651.48. For 1942 petitioner's books show an operating loss of $23,885.99 after payment of officers' salaries of $64,000 on a production of 172,076.98 tons of coal. The total officers' salaries was reduced in 1943 to $37,333.40 and a net profit was shown of $30,850.20 on a production of 123,518.905 tons of coal. Petitioner ceased operations July 31, 1943. The salaries paid by the petitioner to each of its officers for the years 1939 until July 31, 1943, when it ceased operations, were as follows: Year
John S. Carr
James E. Carr
John N. Carr
1939
$ 6,500.00
$ 400.00
$ 340.80
1940
8,600.00
3,200.00
1941
24,110.00
20,000.00
20,000.00
1942
24,000.00
20,000.00
20,000.00
1943
14,000.00
11,666.70
11,666.70
*198 In his determination of the deficiencies for 1941 the respondent reduced the officers' salaries to $12,000 for John S. Carr, $8,000 for James E. Carr, and $5,000 for John N. Carr. Opinion We think that the salary allowed by the respondent to each of petitioner's officers was reasonable compensation for the services performed by such officers. John S. Carr and James E. Carr were both experienced coal mine operators. John N. Carr was only 21 years of age in 1941. His first year of any substantial earnings was 1940 when he received $600 salary from petitioner and $1,800 from a corporation owned by John S. Carr and his brother. He had been "brought up" in the coal mining business and according to the evidence had a thorough knowledge of most of its phases. Thus, apparently, all of the officers were well qualified for the jobs and performed valuable services for petitioner. By comparison with other similar business it might be said that petitioner's organization was top-heavy with high salaried executives. Evidence was adduced by the respondent as to the organization and operations of several other companies engaged in mining coal by the stripping method in the Pittsburgh area. *199 The Penowa Coal Co., with a capital investment of $3,700, produced in 1941 over 202,000 tons of coal with gross sales of approximately $336,860 and a net profit of $17,822.14. It paid its secretary and treasurer $6,000, its superintendent $4,500, and its assistant superintendent $3,600. They were its only salaried officers. The president of the company received no salary as such. He operated one of the shovels for regular wages. The company sold its coal through a selling agent for a commission of 15 percent. Another coal stripping company operating in the district of Pittsburgh, Shirley Gas Coal Corporation, had production of 138,949 tons of coal and gross sales of $590,120. These sales were handled by a related corporation whose officers served both companies and whose salaries were split between the two companies. The president received a combined salary from both companies of $6,000, and the secretary and treasurer $300 a month until August, 1941, when his salary was raised to $330 a month. There were no other salaried officers. Another strip mining company, Fairfax Mining Co., operating in Preston County, West Virginia, and using substantially the same methods as petitioner, *200 had gross sales of coal of approximately $405,000, and paid its officers, president, vice president, and secretary and treasurer, total combined salaries of $26,000. Its coal was sold by a sales agency for a commission of 8 percent. Petitioner with net sales of $365,544.87 in 1941 paid salaries to its three principal officers in the total amount of $64,110. Those salaries were jumped from $11,800 (for all three officers) in 1940, although there is no evidence of any substantial change in the duties of any of the officers or in the value of the services performed by them. The increased 1941 salaries were said to have been agreed upon at or about the beginning of the year, and during the Christmas holidays, when the officers were all visiting their mother. They then agreed informally that they would receive salaries for the coming year of about $23,000 each. The exact amounts were determined later at a directors' meeting held in March or April, 1941. James E. Carr testified as to the salaries as follows: * * * In 1940 we talked it over from the experience that we had gained - from what I had gained from the starting of my coal experience in 1916, I figured I was worth more money *201 to the company than what I was receiving; so we agreed - we had a meeting, a formal meeting and talked it over. We came to the conclusion if business justified in 1931 [1941], there would be an increase. But the first time we had talked about it, we had no set salary. We were going to set it according to our business in 1941 which was agreeable to all. Q. When was this discussion that you are now referring to? A. It was while we were on an automobile ride; it was a holiday, it was either Christmas or New Year's; Christmas of 1940 or New Year's 1941. * * *
Q. Did you consider the salary paid to you in 1940 as representing all that you were worth in that year? * * *
A. No, but it was not a question of what I was worth, or what I thought I was worth, or what the company thought I was worth. It was the earning power of the company that really determined the salaries. That testimony of petitioner's president clearly shows that what the officers meant to do was to divide up most of the profits of the business between themselves as salaries. While John S. Carr was the only one of the officers who owned any of the company's stock, and he owned all of it, they were all *202 closely related by family ties and had a common purpose to serve by the arrangement. In view of all the circumstances we think that the salaries allowed by the respondent are reasonable. Decision will be entered under Rule 50.